IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 17, 2018

**IN RE SOPHIE O., ET AL.**

**Appeal from the Circuit Court for Sevier County**
**No. 16-TM-7-I     Ben Hooper, II, Judge**

_____

**No. E2017-02185-COA-R3-PT**

_____

Elijah O. ("Father") appeals the October 6, 2017 order of the Circuit Court for Sevier County ("the Trial Court") terminating his parental rights to his minor children, Sophie O., Micah O., and Samuel O. (collectively "the Children"). We find and hold that clear and convincing evidence was proven of grounds to terminate Father's parental rights to the Children for abandonment by wanton disregard pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv); for substantial noncompliance with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2); for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3); and for failure to manifest an ability to parent pursuant to Tenn. Code Ann. § 36-1-113(g)(14). We further find and hold that clear and convincing evidence was proven that it was in the Children's best interests for Father's parental rights to be terminated. We, therefore, affirm the termination of Father's parental rights to the Children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and THOMAS R. FRIERSON, II, JJ., joined.

Andrew N. Wilson, Sevierville, Tennessee, for the appellant, Elijah O.

Herbert H. Slatery, III, Attorney General and Reporter; and W. Derek Green, Assistant Attorney General for the appellee, State of Tennessee Department of Children's Services.

# OPINION

## Background

The older two of the Children were removed initially from the custody of Father and Erin M. ("Mother") in January of 2011 because both parents were in jail. They were placed with a family friend along with their older half-sister.[1] In August of 2011, it was discovered that the family friend had abandoned the two older children with Mother against prior court orders. Because it was determined at that time that Mother was working with services in the home and was making great progress at rectifying the issues that led to the Children being taken into State custody, custody of the Children was given back to Mother. While Father, who recently had been released from incarceration was to be allowed supervised visitation with the Children, Mother was not allowed to be the person supervising his visits. In January of 2012, an order was entered recognizing that Mother was maintaining stable housing, employment, and transportation and was participating in Celebrate Recovery. The January 2012 order stated that custody of the Children would remain with Mother and that in-home services and all counsel were relieved of the matter, and the case was closed.

In August of 2012, DCS received a referral of drug exposure, and Mother failed a drug screen. In September of 2012, the two older of the Children were again removed from Mother's custody due to her drug use and reports that the Children were being left with Father without supervision. Both parents were granted supervised visitation. In October of 2012, Father was arrested on an outstanding warrant. In December of 2012 the youngest of the Children was born drug exposed and was immediately removed from Mother's custody.

A permanency plan was created for the Children, and Father successfully worked on the tasks assigned to him in the plan. In September of 2013, a ninety-day trial home placement for the Children with Father began. A hearing in December of 2013 held the trial home visit successful, and custody was returned to Father with Mother ordered to have no contact with the Children. The case again was closed.

In November of 2014 it was discovered that Mother was staying with Father and the Children, and the Children again were removed from Father's custody. Both parents were granted supervised visitation and ordered to pay child support.

A permanency plan was created dated December 1, 2014 with a stated goal of return to parents. Under this permanency plan, Father was to contact DCS to schedule

---

[1] The older half-sister is Mother's daughter by another father.

visitation and provide for the Children's needs during visitation, follow court orders, maintain employment and provide proof monthly to DCS, pay child support, maintain transportation, maintain housing sufficient to meet the needs of the family, and attend faith-based couples counseling and provide proof to DCS, among other things. Another permanency plan was created dated May 26, 2015 with adoption being added as a concurrent goal. The requirements for Father under the May 2015 permanency plan were substantially the same as under the previous plan. This plan also required Father and Mother to notify DCS of any changes in their relationship status. A Judicial Review Hearing Order entered on July 22, 2015 stated: "Guardian ad Litem continues to express concern regarding trust (of Father). Court stated that Guardian ad Litem is right." Another permanency plan was created dated November 2, 2015 with a stated goal of adoption. The tasks for Father remained substantially similar to the tasks in the previous permanency plans.

On October 30, 2015, DCS filed a petition seeking to terminate both Father's and Mother's parental rights to the Children. At the time of trial on this petition, both Father and Mother were in jail. After trial, the Juvenile Court for Sevier County ("the Juvenile Court") terminated Mother's parental rights to the Children by order entered May 12, 2016. Mother appealed the termination to this Court, and we affirmed the Juvenile Court's May 12, 2016 order.

The Juvenile Court entered an order on May 16, 2016 dismissing the petition seeking to terminate Father's parental rights after finding and holding that DCS failed to prove both grounds for termination and that termination was in the Children's best interests. In the order dismissing the petition as to Father, the Juvenile Court specifically found and held:

> Prior to [Father] returning to jail in August, 2015, the Department was close to returning physical custody to him on the basis of a trial home placement. A video surfaced which resulted in his probation being violated. There is no indication about who posted the video or when it occurred. Nevertheless, that video resulted in his probation being violated and the trial home placement could not go forward. This court notes that there was no wrong-doing at the time except as it relates to mother's drug addiction. There is not sufficient proof that [Father] did anything to endanger the children except as it relates to [Mother].
>
> * * *
>
> This Court cannot find that it is in the best interest to cut off contact between the children and a father who 100 percent loves them. The world

is full of fathers who don't care and take no responsibility. The world is full of fathers who are addicted and absolutely care nothing about their children. This court cannot find that [Father] is one of them. This Court does not exactly know what will happen in the future, but it cannot find that it is in the best interest of the children to cut off contact between the children and the father.

Father was released from jail on May 3, 2016. Another permanency plan was created and dated May 23, 2016 with stated alternative goals of return to parent and adoption. The tasks for Father under this permanency plan remained substantially the same as under the previous plans.

Father again was arrested in August of 2016. On October 18, 2016, Father was found in violation of his probation for incurring new charges and ordered to serve the balance of his sentence with credit for time served.

Another permanency plan was created and dated November 29, 2016 with a stated goal of adoption. This permanency plan noted that Father no longer was on probation, had been sentenced to serve his remaining time in jail, and had incurred a public intoxication charge, an aggravated domestic assault charge, and a violation of probation since being released from jail in May of 2016.

In December of 2016, DCS filed another petition seeking to terminate Father's parental rights to the Children. The case proceeded to trial in March of 2017.

Krista Fox, the Children's DCS family service worker, testified at trial. Ms. Fox has worked on this case since May of 2015. At the time of trial, the oldest child was eight years old, and the youngest had just turned four.

Ms. Fox testified that pursuant to the permanency plan of December 1, 2014, Father was to follow court orders, maintain employment and provide proof of employment to DCS, pay child support, maintain transportation, maintain housing, attend faith-based couples counseling and provide proof of attendance, and provide WIC vouchers to foster parents. Ms. Fox testified that the December permanency plan was ratified in January of 2015, and the parents stipulated to noncompliance with court orders addressing safety and visitation. The order ratifying the permanency plan also provided that the parents were to submit to hair follicle exams and stated that the court suggested that the parents not have alcohol in the house.

Ms. Fox testified that prior to her being assigned to this case, Father had tested positive for marijuana. She further stated that at that time Father was renting a trailer,

was employed, had a car and valid driver's license, and was paying child support. Ms. Fox stated that Father and Mother were not together when Ms. Fox began working on the case.

Ms. Fox testified about the permanency plan created in May of 2015. This permanency plan required Father and Mother to notify DCS of any changes in their relationship status. The permanency plan also provided that if drug screens were failed, an A&D assessment would be required. Ms. Fox believed that prior to his going to jail in August of 2015 Father was in compliance with the permanency plan.

Ms. Fox testified that in July of 2015 Father was doing well, and they had moved to unsupervised visits and were about to start overnights. Then a safety concern arose which "warranted immediate action" and the Children were removed from the home. The safety concern arose out of a video involving Father. Father then went to jail August 3, 2015.

Ms. Fox testified that the video was sent to her via email from someone on the Child and Family Team. She received the email with the video on the same day that Father was to begin overnights. The Children already were with Father as they had gotten there around eight in the morning. Father was to take Sophie to therapy while his mother watched the boys. Ms. Fox received the video around the time that they were in therapy. Ms. Fox testified that the video clearly appeared to be of Father and it appeared to take place at the home where Father was staying with the Children. Ms. Fox was asked if Father admitted it was him in the video, and she stated: "He said at our last termination hearing that, yes, that's him in the video, but it wasn't his hand shooting the gun." After she viewed the video in the email, Ms. Fox also saw the video on Father's Facebook page. She stated: "that appeared to be [Father] in the video and it looked like that person was firing the gun." Ms. Fox was asked what was concerning about the video and she stated:

> It was both the language and the fact that there was a gun first off in the home at all without our knowledge because we need to know if it's there and make sure it's - - if he was allowed to have one, like any parent, that it was properly kept so that the children wouldn't have access to it or I wouldn't have allowed them in the home in the first place. And, then, also, he references the house and says, come and get me, you know where I'm at. And that was extremely concerning because he's inviting some sort of violent conflict because he's shooting a gun and challenging someone with cuss words to where his children were at that exact moment. . . . That was why we felt it was - - we needed to take immediate action to remove them

5

from that location so that - - Because, like we said, anyone could see that video.

Ms. Fox identified the house in the video as Father's, and stated:

> You can see parts of the porch. But, also, when the video starts, it's looking out and there's a gravel driveway that comes up. And it's - - I have been literally right there. That tree is in the same spot. I mean, that is what I recognize as the same house that I've been to on several occasions. . . . That was the exact same spot that that Crockpot was in when I was inside the house on several occasions.

Ms. Fox further testified:

> And then at the end, there is a zebra print Crockpot that I was very aware of because when I did my home visit prior to that, I noticed it because it's zebra print and I like zebra print. . . . And right inside the kitchen door is where the Crockpot was.

Ms. Fox testified that she asked Father on the day she saw the video if he had firearms in the house. He told her that it was his cousin's and that it was not in the home. Ms. Fox stated that during the first termination trial Father "said he was creating the video for a rap video or something and that he was ashamed of that fact and that's why he didn't say it earlier." Father told the judge at that trial that he was not the one shooting the gun because he had tattoos on his hands. Ms. Fox testified that the first time she saw the tattoos on Father's hands was at the first termination trial in March of 2016.

Another permanency plan was created and dated November 2, 2015. The tasks on this permanency plan remained substantially the same as on the previous plans. Ms. Fox testified that Father was unable to participate in the development of this plan because he was incarcerated.

Ms. Fox testified that DCS arranged and paid for Father to have a mental health assessment while in jail. The assessment recommended individual counseling. DCS paid for Father to have the individual counseling while in jail.

Ms. Fox testified that in 2015 Father had appropriate housing in a trailer in Seymour. In 2015, Father provided DCS a letter from his employer stating that he was employed. Ms. Fox stated that other than the new charges, for the most part, Father was doing what he was supposed to do under the permanency plan. Then Father went to jail.

Father was released from jail in May of 2016. Ms. Fox testified that since then he has not provided proof of employment and has stated that he is living with his father. Ms. Fox never had been to Father's father's home. When Ms. Fox asked Father if that was where Father planned to live with the Children, he told her "no."

Ms. Fox testified that when Father was arrested at the DCS office in August of 2015, his car was impounded. Ms. Fox testified that Father was not able to get the car back. Ms. Fox stated that there were some transportation issues after Father lost his car to impound, but Father was working on getting transportation and was "pretty good about calling" and letting Ms. Fox know if there was a transportation problem.

Ms. Fox testified that during the first six months after creation of the May 2016 permanency plan Father violated his probation and incurred two new charges. Father admitted during the permanency plan ratification hearing that he was facing a charge of public intoxication.

Ms. Fox testified that Father did attend Sophie's therapy appointment and did attend medical and dental appointments before he was incarcerated. To Ms. Fox's knowledge, when he was not incarcerated Father did pay child support. Ms. Fox also testified that Father told her that he was doing construction, but he never provided a pay stub or any other proof of income.

Ms. Fox testified that between May of 2016 and August of 2016, she called Father to come in for a drug test on two occasions. The first time Father told her he could not because he was stuck at work in Knoxville and did not have transportation. The second time he also was working, and Ms. Fox told him that she would stay late so he could come in. Ms. Fox told Father that he just needed to let her know he would come in late, but she never heard from him. Ms. Fox explained that usually DCS gives people two or three hours to come in depending upon where they are at the time. Ms. Fox stated that typically when a parent fails to show for a drug screen DCS considers that a failed drug screen.

Ms. Fox supervised some visitations between Father and the Children. She stated that during visitations Father "[i]nteracts okay" and entertained the Children. Ms. Fox testified that after being released from jail in 2016, Father cancelled some visitations, but "usually he was really good about calling and confirming and letting [Ms. Fox] know in advance if something was going to happen." Ms. Fox stated:

> I don't recall any cancellations before he went to jail in August of 2015. Once he got out from May of 2016 until August of 2016, during that time, some of the reasons that he had to cancel was that he had to work. . . .

7

There were some transportation issues. I believe his car broke down. And then one, one at the end when we had them all combined like for Sophie's therapeutic visit to happen with the boys. And that one was just a no call, no show.

After the first termination trial, a new permanency plan dated May 23, 2016 was created. This permanency plan required Father to follow a plan created with the therapist in regard to Mother's contact with him and the Children, attend medical and dental appointments to learn about Samuel's and Sophie's needs, participate in family therapy, notify DCS about any changes in relationship status or living situation, follow recommendations of his mental health assessment, submit to random drug screens, pay child support, maintain appropriate housing, maintain employment and provide proof to DCS monthly, comply with his probation, and not incur any new charges.

Ms. Fox testified that Father never notified her after Mother was released from jail in May of 2016 that Father and Mother had started talking and hanging out regularly. Ms. Fox stated that Father never notified her that he was having contact with Mother at all. Ms. Fox heard Mother's testimony during this trial about being friends with Father starting in May of 2016, and she stated that she would consider that a changed relationship status, which Father should have reported. Ms. Fox was in contact with Father's therapist, and Father never told his therapist about seeing Mother either. Ms. Fox pointed out that DCS was paying for Father's therapy.

Ms. Fox testified that during the Foster Care Review Board held on August 11, 2016 the Children were present and Sophie stated that she does not want to return to Father and that she wants to stay with the foster parents. The boys were around six and three years old at the time, and they did not speak up. Ms. Fox was asked if the boys were questioned, and she stated:

> They were. Micah is only like six and Sammy was only three at the time. And, so, their answers were more play-based and school-based, you know. So, they didn't really talk about anything like that. But Sophie had stated before she went in that she wanted to make sure they knew that, just like she had said about the Judge.

Ms. Fox sees the Children at least once a month. She usually does a sibling visit picking the Children up at their respective daycare or after-school program and taking them to see their older half-sister for a few hours and then taking them back to the foster home. The monthly sibling visits are with Mother's daughter who is eighteen years old. Ms. Fox testified that Sophie "absolutely adores" her older sister and "wants to be like her," and Micah "just loves on her all the time and basically is like physically on her at

8

all times." Ms. Fox stated that Sammy doesn't "really know her or recognize her that much," but he goes with his brother and sister and is "excited to play." These sibling visits happen monthly. The sibling visits are supervised visits and usually last about two hours.

Ms. Fox stated that Father has "always been very appropriate. . . . even when he's like not happy about something, he still is appropriate." Father was upset during her last visit to him at the jail because "he felt it wasn't fair" and expressed that he felt like "anybody could say that they were assaulted by anyone and then that person [would] end up in jail . . . ."

Ms. Fox testified that Sophie has some anxiety because they "still have not been able to tell her an answer of what's going to happen. And she's eight and, so, she has anxiety about what is going to happen." But she stated that "all the kids really are well adjusted" in the foster home.

Ms. Fox was questioned about Sophie being afraid of Father, and Ms. Fox admitted that her testimony during the last termination hearing was that the only example Sophie gave for being scared of Father "was that he yells when he drives or just driving. That was the only actual example given."

Ms. Fox testified that in September or October of 2016 Micah also began therapy. He had been in therapy for approximately six months at the time of trial. Ms. Fox stated that Micah "was having a difficult time processing" and "would become extremely emotional," so he was put in therapy to work on identifying emotions. Micah has made progress in therapy and is doing better now.

Ms. Fox believes that termination is in the Children's best interest because Father's continued incarceration keeps the family from being able to bond, and the Children are doing well with the foster family and in school and are stable and happy.

Mother testified at trial that she and Father have had an on-again-off-again relationship for about fifteen years. She stated that Father drinks regularly, a minimum of four days a week, and drinks "to get drunk." Father was arrested during the summer of 2016 for public intoxication. Mother stated that Father has been arrested on this charge other times too.

Mother testified that when Father had full custody the Children were removed from his custody because Mother "was in the home," and there was a no contact order in place. Mother testified that she was living in the home at that time and helping to care for the Children. Mother stated that she: "Took them to school, picked up medication

from the pharmacy, took them to the doctor. But the doctor actually had to - - wouldn't see Micah because I was there, and on the Order, it stated that I was not allowed to have contact with him." Mother testified that Father also took care of the Children. Mother stated that she believes Father is a good father and that he loves the Children. Mother testified that Father took her to the school and put her name "on the list," and told Mother that "[b]ecause he had custody, he was the one who made the decisions," despite the fact that there was a restraining order in place preventing Mother from having contact with the Children. Father also allowed Mother to talk to Sophie on the telephone. Mother stated: "He told me that she had gotten very angry with him and wanted to see her mother and that was why he was calling me, to leave my husband and everything and come and be with the kids." Mother admitted that she was aware when she spoke with Sophie that she was violating the restraining order. Mother was asked if she had any conversations with Father about the restraining order and she stated: "Well, yes. I mean, I had said, "Well, I'm not allowed to be around the kids". And he said, "Well, yes, you are. I'm the one that makes the decisions on the kids. I have custody. I have full custody."

Mother testified that prior to the summer of 2016 there were incidents of domestic violence between her and Father. Mother stated: "They started from arguing to hitting me to just everything." Father was arrested for some incidents. Mother stated:

> 2010 and '11, I believe. . . . The first one, I told the Judge that I lied so that I - - so that he could get out - - you know, not get in trouble. The second time, he - - I believe he got maybe convicted. I'm not really for sure. He had several, several charges and they all kind of got taken care of at once at that hearing.

Mother was asked what she lied about, and she stated: "I did not want to tell the truth to the Judge because I was afraid they were going to take him away and then I would not be able to take care of my kids. And it, it was a bad decision, but I did it."

Mother stated that she was honest with the police about the incident, but lied to the judge in court under oath about it. Mother was asked why she lied, and she stated:

> It's, it's - - I was, I was doing drugs. I wasn't the same person I am right now. I - - He - - Having him around depended on me seeing and having my children always. And he provided. He took care of us. It was - - I can't tell you. Like now, I could not imagine ever doing that, but then I wasn't in the right mindset, I don't suppose.

Mother was asked if she has had contact with Father since her parental rights were terminated, and she stated:

10

Yes. I got out of jail March - - Or May 3rd, I believe it was, of last year. And he came over that evening to pick me up from my Mom's house and, you know, give me a card. And we went for a drive to talk. And from then on, we would, you know, talk here and there. He was trying to get the kids back. But we did - - You know, we did talk on the phone and we did see each other a couple of times.

Mother testified that she never spent the night at Father's home, but they talked four or five times a week. Mother testified that Father "said that when he got the kids, we could move away and we could start over." Mother was asked if she believed him, and she stated: "Uhm, yeah, I did because I, I know him, I guess. I figured that's exactly what would happen to get me away from my family and we could start over. That's what he always wanted." Mother stated that she and Father weren't dating and weren't "together," but that she "was living on the hope of being able to see my kids again." Mother was asked if she and Father still had a friendship, and she said: "No." She stated that she had her phone number changed because Father was calling her continuously from jail.

Father was in jail for assaulting Mother in August of 2016. Mother was asked to describe what happened, and she stated:

He was staying at a hotel up there by - - across from my job. . . . On 66 up by the interstate. Right before the flea market, there's a gas station. I was working right there. And he got a room there and he asked me to come talk to him. So, I had my mom drop me off after work to go and talk. And he was already drunk when I got there. And I should have known to leave, but I didn't. And he just kept on and on and on. It just - - . . . He choked me. . . . Just screaming, yelling. He choked me so bad that my larynx is fractured - - was fractured. And it still clicks. They said that it may not ever go back - - it may always be like that. . . . I mean, he was pushing me, pushing me around, you know, here and there. And it just wound up - - We wound up - - He had me pinned and he pushed me into the bed and had me pinned down and was choking me to the point where I literally - - I mean, I almost passed out. . . . To this day, I can still hear the gurgling with it. It was horrible. I've never been so scared.

Mother stated that Father was going on and on about:

Facebook, I was a whore, he couldn't believe he lost the kids over me. He has this thing in his head that I was a prostitute. So, that was

11

getting thrown up left and right. Just everything that he could think of just to be angry about. That's how he is when he drinks.

Mother stated that she got free and ran out of the room. She then called someone to come get her. Mother did not call the police because she "was still in that selfish mindset of thinking that if I did that, I would never be able to see my kids again, you know, if I got him arrested." Mother stated that Father followed her across the street and threatened to harm anyone who came to get her, so she couldn't get anyone to pick her up. Mother then went back to the room with Father and a couple of hours later she went across the street to go to work.

Mother went to the hospital the next day and then went to the police. She stated that photographs were taken at the hospital showing fingerprint marks on her neck. She stated that she also had marks on her arms and legs. Father was arrested for aggravated domestic assault. Mother testified that she was not doing drugs at the time of the assault and "had been clean."

Mother went to court twice, once in October and then in November or December. Mother stated that in court: "[Father] started screaming. They had to pull him from the Courtroom and drag him back to the jail screaming "whore", "liar", all kinds of stuff. I mean, they physically had to drag him back there." Mother stated this was not unusual behavior for Father. She stated that he yelled at her like that once during a visit with the Children at McDonald's in 2015. Mother stated: "I was taking too long in the bathroom and he started screaming at me at McDonald's accusing me of subjecting our daughter to lesbian activity."

Mother has never seen Father be violent with the Children. Mother stated, however, that the Children have seen Mother and Father fighting. Mother stated: "they've seen more than I guess I thought they had seen."

Mother was asked if Father got the Children back and called her to come see them if she would, and she stated:

> That's a very hard question. To be with my kids, to protect my children, I would go - - I would be in contact with him, yes. Would I subject them to, to that again? Absolutely not. I would not move in with him. I would not be in a relationship with him. It has taken me years to get where I'm at right now and I don't ever want to go back to that.

Mother admitted that in April of 2011 she was convicted of two counts of prescription fraud. In June of 2010 Mother was charged with the felonious making of a

12

false report. Mother pled to a lesser charge of misdemeanor perjury. In April of 2010, Mother was charged with theft of property, and she pled guilty.

Mother was asked what would make her testimony at this trial credible given her history of lying, and she stated:

> Because, number one, I'm clean. I'm in a better place today then I was then. I was in - - I was a really bad person in my mindset. I don't like the person that I was. And to do - - to lie - - And it would have been a lot easier for me just to pretend like everything was the way that it was and let him get the kids back than to sit here and do this. This is a very hard thing for me to do. And all I want is for my kids to be safe and happy and not to have to put up with any kind of anything anymore. I just want them to be happy. I hope that you do believe me. I really - - There's nothing else I can say, but I just want what's best for my children, you know. I can't give them that and I know that he can't.

Mother stated that Foster Mom "is everything - - She's what I set out to be as a mother. . . . Yeah, she's an amazing lady." Mother further stated: "[Foster Dad] is a very good, good male figure for my sons to grow up to be like. They're, they're in a very good home. They, they are very well taken care of and they're, they're where they belong."

Katelyn West, a licensed professional clinical mental health counselor who has worked for the Sexual Assault Center of East Tennessee in Knoxville since August of 2016 testified at trial. Ms. West previously worked at Omni Community Health, which formerly was known as Solution Source. She worked there for approximately two years as a general outpatient therapist.

Ms. West was Sophie's individual therapist, and she saw Sophie on an almost weekly basis for over a year. Sophie was seven or eight years old at that time. Ms. West stated that Sophie "had quite a bit of anxiety" and "some behavioral issues." Ms. West was not seeing the boys, and she stated that as far as she could remember they were just too young to be seen.

Ms. West stated: "[Sophie] told me she did not want to go home. . . . She would always say she wanted to stay with [the foster parents] and she did not talk about going - - wanting to go home." Sophie made these statements a couple of times. Sophie "said that she was scared and that she was afraid of her dad." Ms. West stated that she tried to question Sophie further, "and she would say that it was because he would get angry and

he yells. But there was, there was nothing else. I mean, like I said, I would try to dig a little bit and it's almost like that made her, you know, more quiet."

Ms. West was asked if there were any traumatic events, and she stated: "[Sophie] would say that the yelling. And I think there was some times when the police showed up at the house and things like that. I remember her talking about that and her just being terrified. And then something about Mom and Dad arguing. But, like I said, she didn't really get into a lot of detail." Ms. West testified that Sophie was not afraid of the police. Sophie once drew a picture of a police officer who was smiling, and Sophie told Ms. West she was not afraid of the police.

Ms. West testified: "Sophie had been getting letters from her dad and she was - - she did not want to read them. Like, you know, we wanted it to be in a therapeutic setting so that if something did come up and she was struggling, we could kind of help her calm down, use coping skills - - . . . stuff like that." Sophie never read any of the letters from Father. Ms. West had the letters in her office and offered to read them with Sophie whenever Sophie was ready, but Sophie refused to read them.

Sophie asked Ms. West to write a letter to the judge telling the judge that Sophie wanted to stay with the foster parents. Sophie dictated what she wanted the letter to say, and Ms. West wrote it verbatim.

Ms. West also met with Father once, but she never supervised any visitation. Ms. West was asked if Father seemed interested in how Sophie was doing, and she stated:

> I remember he seemed very tearful. And I felt like I had to kind of redirect the session back to about Sophie several times because we did spend a lot of time talking about just the situation and like Sophie's mom and some of the struggles that they had as a family.

Ms. West met with Father only the one time, and there was nothing that made her think Father should not be around the Children. Ms. West stated: "He was very kind to me. And, you know, we talked. He was fine."

Erica Sluss, a Foster Care Community Case Worker with Smoky Mountain Children's Home, testified at trial. Ms. Sluss explained that Smoky Mountain Children's Home is a private provider and that the Children are placed in one of their foster homes. Because they are a private provider, Smoky Mountain Children's Home provides a case worker in addition to the DCS worker. Ms. Sluss has been the case worker for the Children's case for about two years and three months. The Children have been in the

same foster home during that entire time. This is the same foster home the Children were in during the previous custody episode.

Ms. Sluss has at least two face-to-face contacts with the Children each month, but usually more than that. She supervises visits, and she sees them in the foster home at least once a month. Ms. Sluss was asked about the foster home, and she stated: "The kids recently went to Disney. They are treated as they're their biological - - you know, a biological kid would. They do have a biological kid that lives with them. And they all interact as if they were all, you know, together and not, you know, a foster child."

Ms. Sluss testified that Samuel is very bonded with the foster parents and calls them 'Mom' and 'Dad.' She also stated that Micah "interacts well" with the foster parents. Ms. Sluss testified that Sophie is "very, very connected with [the foster parents]. . . . [S]he's said that she, you know, wants them to adopt her." Sophie has made this statement to Ms. Sluss multiple times. Ms. Sluss testified that Sophie makes "excellent grades" at school and has good friends.

Ms. Sluss testified that during visits "whenever [Father] would go to hug [Sophie], she would kind of, you know, move away some." Sophie does not behave that way with the foster father. Ms. Sluss testified about visitations stating:

> The kids, they mostly - - You know, they mostly would play. The interaction with [Father], he mostly just watched. The kids, if they were doing things that they were not - - If they were doing things and they needed correction, he wouldn't correct them so much. At one point, he asked me not to correct them because Micah had became upset and he only - - And his response to that is that he only gets to spend a little amount of time with them and he does not want to see them upset.

Ms. Sluss explained that the one time Father had gotten upset when she corrected the Children for behavior she had done so because Samuel had fallen and gotten hurt. Ms. Sluss then corrected Micah.

Ms. Sluss stated that Father was good about attending visits. He cancelled some due to transportation issues, but usually would call twenty-four hours before the scheduled visit to confirm. Father would bring food and toys and things for the Children to the visits. Ms. Sluss testified that when the Children were visiting there were increased behavior issues, and the Children would get into more trouble at school. The last time Ms. Sluss went to pick the boys up for a visit Sophie thought she was being picked up too, and Sophie ran and hid from Ms. Sluss, which Ms. Sluss stated was unusual behavior and not the way Sophie usually greeted Ms. Sluss.

15

Father testified at trial that he currently is incarcerated in the Sevier County Jail as he was transported from Bledsoe Prison to attend the trial. Father stated that he was at Bledsoe for approximately a month or a month and a half. Prior to that he was at the Sevier County Jail. Father went to jail this time on August 8, 2016.

Father testified that his total sentence is ten years at thirty percent. He has "completed almost four years day for day, not counting good time on that sentence." Father stated:

> With good time, I would probably say I have around four years left. And, plus, I will also get good time on that. So, you know, at the most, I'll probably do about three more years if I had to, which I will not. I have a parole date in two months, less than two months.

Father testified that this will be his first parole hearing. There is no guarantee that Father will get out on the day of his parole hearing, but Father stated:

> But I've been informed by certain parties that have I [sic] an eighty-five percent chance to make parole considering that no one ever makes it five years on State probation and I, I had done it. And all the things I have in my file that, you know, I - - It just proves that - -

If he gets out on parole, Father will have six more years of parole "because you don't get good time when you're on the street." Father explained: "The way basically to break down good time at TDOC is you get a month for every two months you do. So, if I do two months, three months counts on my sentence." Father testified that when he gets out of jail he plans to work for a friend, Rod Goodman, who runs a cleaning business.

Father was asked why he went to jail this time, in August of 2016, and he stated: "I went to jail because of a false allegation that was put on me by a woman who has a history of false allegations. And that's the only evidence they have. She said that I assaulted her and they arrested me two weeks after the assault allegedly." Father testified that his previous charges for domestic assault also were based on fabrications. Father was asked if some of the charges involved Mother's mother, and he stated that they did. When asked if Mother's mother was in on the lying, Father stated: "Yeah. You know she was."

Father was asked when he had his first felony conviction, and he stated: "It was when I was a young child and it was aggravated burglary for forcing my way into a man's home." Father was asked how old he was at that time, and he stated: "Roughly

16

around twenty." When questioned about why he had stated that he was a child, Father stated: "I didn't grow up till I went to prison. I didn't become a man. . . . Until after my children were born."

Father was asked what other times he was arrested last year, and he stated:

> I was arrested for a P.I. charge. As you can see in how the warrant reads, it was at - - outside on a table. I was asleep inside my tent. The table didn't even connect to my campsite. It was for a different campsite, which is why it was dismissed because I was not drunk. I was asleep inside my tent. And the table that the alcohol was found on belonged to the other campsite. And for that reason, the Judge found good reason to dismiss it.

Father admitted that this was not his first public intoxication charge. He stated that he previously was arrested for public intoxication by a close friend of Mother's in 2013 or possibly earlier, and he explained that Mother previously was a police officer. Father stated that this arrest occurred during the time period when he was fighting for his Children, which was during the previous custody episode. Father stated that: "It was [Mother] trying to have my violation - - my parole violated so I wouldn't be able to fight for my children." Father claimed that he was released by the magistrate for being wrongfully charged, but that he paid the $200 fine and that he "didn't know at the time that that made you guilty." Father was asked if there were any other times he was arrested for public intoxication, and he stated:

> Not to my recollection. I mean, I can't hold that for sure. But from what I can recall right now, no, I don't, I don't remember. . . . I believe when I was younger, I had been arrested for underage consumption, under twenty-one. . . . I was kind of a, a wild kid when I was younger.

Father was asked if he remembered being arrested in January of 2014 for anything, and he stated: "No, I don't remember that. Was I? . . . Right. You've got to make it seem like I'm a liar, right? I get it. . . . I get it. Hey, it's a good strategy."

Father admitted that he has incurred charges while he has been in jail. He was charged with assault for getting into a fight. Father stated that this happened during his previous incarceration.

Father was asked if he had issues at any other court hearings, and he stated:

> Uhm, I've been upset at a couple of hearings, yes. . . . It was I want to say October [the same month as the other incident]. . . . I informed the

Judge that I had a conflict with the Public Defenders office. And he said he didn't care. He was - - I could take it up with the Judge who was initially (sic) going to do the hearing. And I may, I may have raised my voice when I told Amber that - - how she - - I asked her how she expected to represent me considering I had never so much as even talked to her or gotten a letter from her or anything. . . . I probably yelled, yes.

Father stated that he was allowed to remain in the courtroom after yelling.

Father admitted that he "may have yelled at the one - - at my VOP hearing, as well," which occurred around the same time. He stated:

I tried to explain that I had a conflict of interest with this woman because she represented the husband of the only witness there. And they didn't want to hear it. They - - And I had never seen her about this case before in my life. There's no way she could represent me adequately. And they didn't want to listen. So, my emotions got the better of me. . . . Yes, I was yelling. . . . And I was - - I told her - - You know, they, they were railroading me. They just wanted to, you know, I believe - - And I'm not accusing or attacking anybody because I firmly that I'm incarcerated because I fought for my children.

Father stated that he was yelling at Amber Haas, the public defender, and he again was allowed to remain in the courtroom. He stated: "The Judge wanted me there so I could continue my hearing."

Father stated that Ms. Haas represented Mother's husband, "Robert Moore I want to think is his name." Father stated that Mother married Moore "about twenty-three days after she gave birth to my youngest son." He further stated: "She gave birth on the 6th. DCS took him from her at the hospital on the 8th. And then the following January, she was married to this drug dealer she had just met."

Father heard Mother's testimony during this trial about his drinking and stated that he does not drink as much as she testified he did. He further stated that he "had a hair follicle test for binge drinking and passed it." Father stated that this hair follicle test was done within sixty days of the hair follicle test that showed positive for THC. Father testified that he drinks on special occasions, "[s]ix, seven times a year, maybe." He stated he likes "Bud Light." When asked if he gets drunk, Father stated: "I don't like being drunk. It alters my, my perception on things. So, usually, I don't, no." Father stated that the last time he was really drunk was when he was about twenty years old.

Father admitted that he has "drank liquor before," but stated that it is not one of his usual things "because [he] like[s] the taste of beer."

Father was asked how often he smokes marijuana, and he stated:

Well, considering I did five years on probation and never once failed a drug screen, I very rarely smoke marijuana. But, you know, - - And, of course, all the times I've worked with DCS, I've never failed a drug screen. But I smoked marijuana at Christmastime. It was roughly a month after my children were taken. I mean, I - - It was wrong. It's illegal. I personally don't see it as a drug, but that doesn't matter. I'm not the State of Tennessee. And not to give no excuses, but my therapist who I later worked with, who DCS kindly enough paid for, she said that I was self-medicating because of depression. Of course, that's her opinion. I don't know.

Father was asked if he thought he was depressed, and he stated: "Oh, I'm absolutely depressed, yes. They have recently put me on antidepressants. I get antidepressants. They help." Father was asked if he attributed his depression to not having the Children, and he stated:

Yes, it was because I - - Well, you know, I mean, I was a single daddy. So, from the time I woke up in the morning, I get the kids ready, I, you know, get them off to school, take the other ones to daycare, go to work. You know, I worked a job. I, I took care of my kids by myself. I ran a business. Ran two businesses, actually. And I also went to college full time. You know, I was very busy. And that night when I came home, you know, there, there was no empty - - It was empty. There was no little feet running around driving me crazy. There was no little teeth to brush or little ears to read stories to at night. You know, my - - Regardless of any testimony, my children love me to death. And I'm all they've known because I've always been there.

Father admitted that he may have put Mother's name on the pick-up list for school "after I allowed her to start seeing the children," but stated that he was not sure if he did or not. When it was pointed out that in December of 2013 there was a no contact order for Mother and the Children, Father stated: "I found that out later. . . . I didn't know that at the time." Father testified that Mother was not living with them at that time. He admitted that during the previous termination trial when he was being questioned:

Mr. Smithwick - - . . . was asking you some questions. And I think you were telling him that [Mother], that he scares her. And I think you said, "Do I look nervous to you? You don't confuse me. That woman was not living with me". And then, "Your Honor, she did not move into my home until after they came and took the children. I did let her see the children and she did stay the nights with us sometimes. I even put her on the pick-up lists at the daycare to be able to pick up our son."

When questioned further Father insisted that currently he could not remember if he put Mother's name on the pick-up list, and he stated: "I don't lie. . . . I don't lie under oath."

Father testified that when he was arrested in June of 2016 for public intoxication that he was out of jail the next day. He stated that he called Ms. Fox "within a couple of weeks" and told her about the arrest. When asked if he heard Ms. Fox's testimony that he did not tell her until the hearing, Father stated: "I heard her say not to her recollection; she couldn't quite recall." Father testified:

I told her I had some bad news. She said, "Uh-oh, what is it?" And I said, "Well, I have had a little snag. I won't -- It won't affect anything. I've already talked to my probation officer. They're not going to violate me for it. I am not going to plead guilty." And then I explained to her how the last time I went ahead and paid the fine and it made it look like I had plead guilty I because that's what it does. I didn't know that. And I told her that and that's why I wasn't going to pay the fine and, you know -- . . . But, of course, you know she says she doesn't remember that, but it's possible that I could have told her. She couldn't tell you yes or no. She said she couldn't remember.

Father was questioned about the video, and he stated: "I didn't have [Mother] set up the Facebook. I've never had a Facebook in my life because I don't like social media." He further stated: "She, she claims that she set it up so I could use the Messenger to her. That's Messenger. I didn't use the Messenger - - Well, Messenger is on Facebook, isn't it? . . . Okay. Then, yes, yes, I used that." Father stated that he used Messenger to send messages to Mother, but that he believed that Messenger was "a sort of side dish to Facebook." Father was asked if he was stating that he never used Facebook for anything else, and he stated: "I can't say yes or no. It's been awhile."

Father denied posting the video, but when asked if it was him in the video he stated: "Some of it." He stated: "it's a snippet video. The first part was me." Father admitted that the face in the video is his. Father stated that his cousin shot the gun. Father claimed that his cousin spliced the video together somehow. When asked if he

20

was stating that his cousin took a video of him talking and spliced it with the cousin shooting a gun and Father continuing to talk while his cousin was shooting the gun, Father stated: "I believe so." Father testified that his cousin told Father that he was going to be putting someone in the video shooting a gun. Father stated: "Yeah, it's for a rap song. . . . It's, it's a video. It's a music video. And that's why it's so short because right after the final words that I say is when the music starts. We didn't get a chance to finish it because I got incarcerated."

Father stated that Mother testified during the previous termination trial that she put the video on Facebook. When asked how Mother got the video Father stated: "You would have to ask her. I would assume that my cousin gave it to her somehow." Father testified that he has no other rap videos on Facebook, but that his cousin puts videos on a "local music thing" and that they probably are on YouTube also. Father was asked if he has a rap persona or name, and he stated: "Yeah, Kaos."

Father testified that the video was filmed at "a friend of my cousin's house" not at his house. Father admitted that he had a crockpot like the one Ms. Fox testified she saw in the video, and he stated that it was "a Dollar Store Crockpot" and "a lot of people have it." Father stated the crockpot cost ten or fifteen dollars and was not one of a kind. Father could not remember what was used to do the filming, but he stated that his cousin usually uses a tablet.

Father testified he does not own any firearms. When Father was arrested for violation of probation due to this video he was at the DCS office, and the police searched his car. Father testified that no gun was found in his car. He stated that he was not charged with possession of a firearm. Father testified: "I never acquired any new charges at all from that video besides the violation of probation."

Father testified that after he got out of jail last May Father continued his counseling with a therapist who was coming to his house once a week. Father testified that these sessions continued even after Father went back to jail this time. Father stated that the last session was in November when the therapist came to see him. Father stated that the therapist was through Covenant Counseling and was helping Father with his depression and controlling his emotions.

Father testified that it has been almost two years, since April of 2015, since he had contact with Mother outside of court. He stated that Mother had messaged him over a year ago, but Father stated that he does not think that he responded. Father was asked if he saw Mother on the day of the alleged domestic assault last summer, and he stated: "Absolutely not."

When Father had custody of the Children, he allowed the Children to talk to the foster parents on the telephone and allowed them to spend time with the foster family during the Christmas season. Father recognized that the Children had been with the foster family for about a year and a half and "had grown to care about them and they wanted to see them." Father stated that he felt a bit jealous about sharing the Children, but that he "felt it was in my children's best interest if they wanted to see them, to let them." Father believes that the Children are safe with the foster parents. When asked if the foster parents take good care of the Children, Father stated: "I believe they love them, yes." When asked if he thought that the foster parents were bonded with the Children, Father stated:

> Not as much as I am, but, yeah. You know, I'm their father. They love me. Every time they see me at a visit, they run to me, "Daddy, Daddy, Daddy". My daughter, she's - - You know, I'm really the only one she can blame for anything because her mom is not around. . . . She's upset with me.

Father testified that he has incurred three new charges since the last termination hearing. Those three charges are public intoxication, violation of probation, and aggravated domestic assault. The public intoxication charge was dismissed with the State having to pay costs. Father testified that he notified his probation officer of this charge, and Father's probation officer did not violate Father's probation for this charge. Father was arrested for the domestic assault on August 8, 2016. Father testified that Mother's version of the event was not accurate. He stated that he did not strangle her. Father testified that at the preliminary hearing on this charge Mother is the only one who testified and there were no other witnesses. Father stated that his probation was violated due to the domestic assault charge. Prior to incurring this charge, Father had complied with his probation for over four years, and Father testified that he had been put on a call-in system of probation.

When he was arrested Father was about to begin a trial home placement. He stated:

> Yes, my - - We already had the date set for August 23rd to come into the DCS and set it up to -- I mean, my kids were coming home in three weeks. I had done everything they asked. I had worked with them for nine months. I started off with [Mother]. She got on drugs. I made her leave. I asked Ms. Fox to split us up on the Permanency Plans. I had started working my Plan by myself. My kids were coming home. And I spoke with my lawyer, Beth Brady, at the time. She picked up that charge because - - The Court appointed her and she picked it up because she was

22

working with me on the kids. She worked for Ross Gray at the time. And I told them - - They - - I told them that I wasn't going to plead guilty to it. And that's when Ross Gray came over personally, stopped whatever he was doing, and they took me up in the back room, him and Beth, and they pretty much told me that my best option was to accept the one year, which with good time, I would be out in nine months. If they filed for the TPR, which Beth was pretty sure they would do, she would do her best to beat it. And then I could get out and I would have to start over. But, basically, Ross Gray told me that if I ever wanted to see my children again, I would need to plead guilty. . . . No, that's, that's why I - - Because I didn't want to plead guilty. So, she ended up - - She explained to me if we entered a best interest plea, I wasn't admitting guilt. I would - - I was just admitting that - - I mean, basically, I was getting it over with so I could go fight for my kids. . . . But she told me - - I was informed that if I entered the best interest plea, it did not mean I was admitting guilt. . . . And that's why I went ahead and did it.

Father was shown the Order from the judicial review hearing of December 11, 2013, and Father stated that it "was the one where I gained full physical and legal custody of my three babies," after the ninety-day trial home placement had ended. Father stated he was given "full physical and legal custody. And it said that visitation was up to my discretion." Father stated that a portion of the order confused him because it stated: "Father shall have final determination on when and if visits occur if there is a disagreement as to scheduling." Father stated: "My understanding was that I had full physical and legal custody of my children, that the Court had determined me to be the protector of my children. That way, everything was up to me whether who seen them or not." Father stated that he "paid dearly" for his misunderstanding and that he now understands "after years of it, it's referring to solely visitations with their older sister." When questioned further, Father admitted that the order actually states:

"Sibling visitation with [the Children's older half-sister] shall occur every other week. Schedule to be determined by Father. [Mother's mother's], visitation will continue at the Sevier County Children's Shelter until the father is comfortable" . . . "moving to outside locations. Father shall have final determination when and if visits occur."

The order also clearly states that the court found that no contact with Mother was appropriate.

Father was out of jail for less than 90 days when he was arrested in August of 2016 on the new aggravated domestic assault charge. He was asked what he had done during that time to prepare for the return of the Children, and he stated:

> In that time, I had began working. I was trying to rebuild my business because when I did the nine months, everything failed. So, I was trying - - I was working on that. I was meeting weekly with my therapist. I was paying, I was paying my bills. Well, it was a light bill and a - - and taxes. I believe I had to pay the taxes either on the property or the trailer. And I had also cleared out a lot also on my dad's property to where I was going to put a new trailer if he decided not to move to Colorado. And I also had the boys' bunk beds set up in one of the rooms at my dad's trailer, which they're still there. And I also had a bed set up for my daughter there.

Father stated that he was working for Noel Construction and was rebuilding his own business of Shamrock Enterprises, which he said was "a promotion and entertainment business." Father testified that he also previously had an excavating business, but that his dump truck and track-hoe had been sold while he was incarcerated, so there was no way for him to rebuild that business.

Father testified that drugs became an issue for Mother in 2008 or 2009 and that he has learned how to tell when Mother is using. He stated that when "she's real skinny" Mother is "strung out." Father also stated: "she'll have track marks all over her arms and her hands right here. That's where she likes to shoot up. They look like little red specks." Father stated that it appeared to him that Mother was in a period of drug use when she testified during this trial. He stated: "If I had to guess, I would say she was high yesterday while she testified." Father was asked about the longest period he was aware of when Mother was not using drugs, and he stated:

> That was about two to three months before they had taken my children because my daughter wanted to see her mother. So, I, I met with their mother. You know, I called Agape, which was an inpatient rehab in Knoxville. And they acknowledged that she had been there, but they wouldn't tell me no more information due to privacy acts. But I checked on that. I seen she was in an inpatient rehab. I met with her and assessed her appearance. And she was very thick. They - - She was, she was beautiful. I can't really - - And that's when I allowed her to start seeing the children. And a couple of months after that, they took my children because I let her see them, which is why I don't understand. You know, they take my kids because I have this woman around her, but they see her fit enough to come testify. I'm sorry. That's - - Anyways, I - -

24

Father stated that "[Mother's] never done anything to comply with DCS whatsoever. The only time I ever seen her comply with DCS or show up for hearings is now when she's testifying against me. She manages to make those hearings."

Father testified that the only time he has not been current on his child support obligation is when he was incarcerated. Father admitted that the child support exhibit admitted at trial shows he made no payments in 2016. He stated: "I was paying money orders. I was mailing them in. They didn't have to garnish my wages. I was pretty adamant about paying my support."

Crystal M. ("Foster Mom") the Children's foster mother testified at trial. The Children lived with the foster family from November of 2012 to August 2013, and returned to the foster family in November 2014 where they remained through the time of the instant trial. Foster Mom testified that Samuel came straight to them after his birth and his release from the hospital in December of 2012. Foster Mom testified that when Father had custody, the foster family did see the Children around Christmas of 2013. Foster Mom also testified that Father has thanked her when she has seen him.

Foster Mom testified that her household consists of her, her husband, her son, and the Children. Foster Mom works full time as a nurse and her husband works full-time in construction. Foster Mom's son is 16 years old. When asked how the Children get along with her son, Foster Mom stated: "They get along well. Some sibling rivalry just like they all have, but - - ." When asked how her son does with the Children, she stated: "He does good. They play and wrestle and all those things." Foster Mom testified that on the weekends they take the Children on outings such as to birthday parties or Jump Jam and that they have taken them on family vacations to Disney World, Six Flags, and to Atlanta for a few days.

Foster Mom testified that Sophie is on the honor roll at school, and Micah is doing "pretty good," but has "some behavior issues at times." Micah gets in trouble for talking at lunch or having a messy desk. Samuel is in daycare. Sophie has her own room at the foster home, and Micah and Samuel share a room. Samuel and Micah call Foster Mom and her husband 'Mom' and 'Dad,' and Sophie calls them by their first names. Foster Mom testified that she never told the Children to call them 'Mom' and 'Dad.' She stated: "They call [Father] their real dad and then just call us Dad and Mom."

Foster Mom was asked how the Children react when they have to do things like attend court hearings, and she stated that "Sophie gets very nervous. Micah does, too. Samuel is not really old enough to understand things. But they do get nervous. And Sophie is very defiant for several days after attending Court hearings."

25

Foster Mom was asked if there were any issues after visits with Father, and she stated: "Micah was very emotional after a visit. Samuel - - After the first or second visit with [Father] when he got out of jail the last time, Samuel started having incontinent episodes. . . . And he had been, you know, potty trained for several months without an accident." Foster Mom stated that since there have been no visits with Father, "[Samuel's] doing better. He does occasional, but not as often as he was at that point."

Foster Mom testified that she wants to adopt the Children if they become available for adoption. She stated: "Sophie has told me she does not like to go to Court and she does want to be adopted. Micah has told me he wants to be adopted. And Samuel does, as well. I'm not sure if he understands that, but - - ." Foster Mom testified that the statements have been made on separate occasions so the younger children are not simply parroting Sophie. Foster Mom stated that the comments are usually focused around the times when they have to go to court. Foster Mom stated that she and her husband have not suggested or discussed adoption with the Children.

Foster Mom was asked about her hopes for the Children, and she stated:

> I think they will thrive. They will grow. Sophie has come a long way since we've had her. And they're doing well. You know, Sophie is doing well in school. She's in third grade, but she tests on a fifth grade level. . . . Micah is doing better. And Samuel is, Samuel is growing and thriving. And they are pretty much free of illness most of the time. They've not had an asthma attack since we've had them back. You know, we attend their regular doctor appointments with them. And I think they will do well.

After trial the Trial Court entered its Termination of Parental Rights and Decree of Full Guardianship order on October 6, 2017 terminating Father's parental rights to the Children after finding and holding, *inter alia*:

> As a quick background, Micah and Sophie were removed from the parents in January 2011, because both parents were in jail. They were placed with a friend of the mother. In August 2011, custody was returned to mother. Then in September 2012, they were removed due to the mother failing a drug screen and father doing drugs in their presence. They were put in State's custody. Then Samuel was born in December 2012, an abused and drug exposed infant. He was removed from mother's custody immediately. We now have three children, Micah, Sophie and Samuel. After father completed a 90 day trial home placement, he was given

26

custody in December 2013. Father was not to allow any contact between the children and mother, but when mother began staying with father all the children were removed and again placed in State's custody on November 12, 2014.

Some highlights of the exhibits that gave father some good marks are found in Exhibit 45 (3-10-16) when Judge Rader would not terminate father's parental rights. Prior to this, the children were placed with the father, Exhibits 19 & 20 (9-4-13). Then the judicial review hearing order, Exhibit #21 (12-11-13) showed all three children with father who had been successful or doing quite well. Exhibit 25 (11-18-14) shows a preliminary hearing order when parents got supervised visitation and ordered to pay child support. As shown by Exhibit 27 (1-28-15) the goal of the permanency plan was to return the children to the parents. Exhibit 28 (5-26-15) was a new permanency plan recommending adoption. The mother had not gotten very involved in the plans and the father had tested positive for THC, even though otherwise father was doing well since the last court hearing on June 3, 2015 through July 20, 2015. In fact, father was recommended for unsupervised visitation. (Exhibit 40, 7-20-15). Then, just when he was to exercise overnight visitation with the children, the "video" incident surfaced and put father back to square one. The testimony of Krista Fox was that "we were on a really good path. He was in substantial compliance. He was paying child support. He had the house set up, the kids bedroom set up." (Volume 1, Day One, p. 86). Then the "video", and the children were removed from father's home. (Volume 1, Day One, p. 88). Father was in jail from August 3, 2015, until May 3, 2016. On March 10, 2016 (Exhibit 43) mother's rights were terminated, and this decision was upheld on appeal. (Exhibit 44). On the same date, (Exhibit 45) the Juvenile Court for Sevier County dismissed the Department's petition seeking to terminate father's parental rights. One of the Court's comments was: "This Court cannot find that it is in the best interest to cut off contact between children and a father who 100 percent loves them."

Then things began to go downhill for the father. He failed to appear for a drug screen due to his working, and then for the next screen he said he would come in but failed to show up. Then Exhibit 47 (6-29-16) a permanency hearing order noted father's arrest for public intoxication on June 11, 2016, and the children were placed in Smoky Mountain Children's Home to stay until the father could complete the permanency plan. Then Exhibit 55 (10-18-16) shows the father being ordered to serve the balance

of a ten (10) year sentence for violation of probation. It is assumed that the public intoxication charge and the "video" episode were the underlying reasons for his incarceration. His release date is uncertain and unknown at the present time. He has been in jail continually since August 26, 2016.

[Erin M.], the mother of the three (3) children was called as a witness. She testified that she believed father to be a good father and that he loves them. She then described a relationship of arguing and assaults taking place between she and the father. She also admitted that she had lied to the Judge in Juvenile Court while testifying hoping it would keep father from going to jail, because she was using drugs and father took care of her and the children. The Court would describe the relationship based on her testimony as the father not being able to live without her and not being able to live with her. She described the August 2016 occasion when she went to his motel room and he choked her to the point that it fractured her larynx. Father had problems living with his dad. "He drinks regularly and he's always drank," she said. Following the choking incident, a hearing was held and the father began screaming at the mother and was physically removed from the courtroom and returned to jail. She told of another incident at McDonald's in 2015, where he became disorderly and was screaming. The children had seen some of their fights between each other.

Mother made a brief mention of an incident in March/April 2016 when father broke her nose.

Katelyn West a Licensed Professional Counselor (Clinical Mental Health Counselor) told the Court that Sophie did not want to go home and always said she wanted to stay with Crystal and Steve (foster parents). Sophie's reason was that she was scared and afraid of her dad. He would get angry and yell.

Mrs. West told the Court that her one visit with the father, did not cause her to think he was a person that shouldn't be around the kids. He was very kind to Mrs. West, and "He was fine." Sophie wanted Mrs. West to write a letter to the Judge and tell him that she wanted to stay with Crystal and Steve.

The cross-examination of Krista Fox continued and she told the Court that visitation was supervised when she began on the case in May 2015. Then visitation became unsupervised day visits, then unsupervised overnight visits were approved, and then the video episode arose and that

28

was the end of overnight visitation. After this, supervised visitation resumed and all appeared to be going quite well. The record reflects a prior history of substantial criminal activity in 2011. My calculations from Exhibit 56 through 69 show a net sentence of 10 years, followed by a violation of probation entered on September 29, 2015, and sentencing father to 365 days and then on October 18, 2016, he was found to be in violation again and ordered to serve the balance of his sentence, less credit for time served. The father was charged with public intoxication on June 11, 2016. Father missed a couple of drug screens as mentioned previously, and a hair follicle test showed positive for THC. It was also shown that the father had complied with the Juvenile Court order with the exception of the violation of probation. He was shown to have gone to Sophie's therapy appointment, attended medical and dental appointments, allowed a Mental Health Assessment while incarcerated and continued with the therapist while he was out of jail and even when he went back to jail. He paid child support while out of jail and provided appropriate housing and was pretty good with providing transportation, but with some issues. Mrs. Fox concluded her testimony on cross-examination that the father was doing what he was supposed to do under the Permanency Plan prior to going to jail in August 2015. Then the public intoxication charge upended all progress. Cross-examination continued and the witness Fox stated that the only reason Sophie ever gave her for being scared of her father and his yelling was that she was scared because he yells when he drives and his driving scares her.

Erica Sluss, a Foster Care Community Case Worker with Smoky Mountain Children's Home told the Court that she had been the Case Manager for Sophie, Samuel and Micah [O.] for about two (2) years and three (3) months. Her work is usually with the children in a foster home. She described the foster home in this case as being as close to a "real" home as it could be. She said Sophie was more comfortable around her mother and would try to move away from her father when he would try to hug her. On the other hand, father was pretty good about coming to the visits, occasionally missing because of no transportation, but he would call 24 hours prior to a visit to confirm the same. He would bring food and toys for the children. She also noticed that when father was visiting with his children that there would be "increased behavior issues", and when the children were aware they would be going to Court again, they would become really anxious.

29

The father, [Elijah O.], was called by the State. One of the things that [Father] expressed throughout all his testimony was that all his children love him to death and he loves them. A good portion of his testimony involved his criminal record, how much time he had, when did he get out, and when did he have to return to build the balance of his sentence. Anytime he was confronted with some of his misconduct and criminal charges, he always had his own spin to apply to the situation, such as false allegations were the basis for his arrest. He does still having pending charges and his violation of probation case is on appeal according to him. He was questioned about his outbursts in the courtroom when he was having a criminal matter heard on more than one occasion. He didn't deny that he was yelling in Court. He appeared to be somewhat in denial about drinking alcohol. He admitted his hair follicle test in March 2015 was positive for marijuana. He is presently prescribed Zoloft for his depression. He denied that mother ever lived with him in violation of a court order. He emphasized that he did not lie when under oath and explained that an apparent conflict in his testimony on two separate occasions just sounded like the truth both times to him. I don't think it is necessary for me to continue to summarize father's testimony. He also appeared to be a father fighting to keep his children. Overall the Court would say that full faith and credit would not be given to his testimony but he without question loves his children. It is worth noting that he did feel that the foster parents would be a safe place where they would receive good care. He thought that his children loved the [the foster mom and foster dad], the foster parents.

[Crystal M.], the foster mother, testified and suffice it to say that it may be that the three (3) children are extremely fortunate to have such a good home while in foster care.

The five issues presented to the Court are all answered in the affirmative and the parental rights of [Elijah O.] and his three children as named herein are terminated. There is clear and convincing evidence to support each issue, particularly the issue of what is in the best interest of these children.

Father appeals the termination of his parental rights to the Children to this Court.

## Discussion

Although not stated exactly as such, Father raises six issues on appeal: 1) whether the dismissal of the previous petition seeking to terminate Father's parental rights

operates as res judicata thereby barring the instant petition; 2) whether the Trial Court erred in finding that clear and convincing evidence was proven of grounds to terminate for abandonment by wanton disregard pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(iv); 3) whether the Trial Court erred in finding that clear and convincing evidence was proven of grounds to terminate for substantial noncompliance with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2); 4) whether the Trial Court erred in finding that clear and convincing evidence was proven of grounds to terminate for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3); 5) whether the Trial Court erred in finding that clear and convincing evidence was proven of grounds to terminate for failure to manifest an ability to parent pursuant to Tenn. Code Ann. § 36-1-113(g)(14); and, 6) whether the Trial Court erred in finding that clear and convincing evidence was proven that it was in the Children's best interests for Father's parental rights to be terminated.

With regard to the termination of parental rights, our Supreme Court has instructed:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[2] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S. Ct. 1388.

---

[2] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

["]Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S. Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed.2d 473 (1996). The parental rights at stake are ["]far more precious than any property right." *Santosky*, 455 U.S. at 758-59 102 S. Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759, 102 S. Ct. 1388 (recognizing that a decision terminating parental rights is ["]*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to ["]fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S. Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated ["]fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S. Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). ["]Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1113[sic](c) provides:

Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[3] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[4] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1113[sic](k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in

---

[3] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[4] Tenn. Code Ann. § 36-1-113(i).

33

conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id.* Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id.* (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

We first consider whether the dismissal of the previous petition seeking to terminate Father's parental rights operates as res judicata thereby barring the instant petition. Father asserts in his brief on appeal that because the previous petition seeking to terminate his parental rights was based upon the same grounds as the instant petition and that initial petition was dismissed as to Father that the dismissal operates as res judicata to the instant petition.

As this Court explained in *In re L.M.H.*:

"The doctrine of res judicata . . . bars a second suit between the same parties or their privies on the same claim with respect to all issues which were, or could have been, litigated in the former suit." *Jackson v. Smith*, 387 S.W.3d 486, 491 (Tenn. 2012).

The Supreme Court has stated the following with regard to raising the defense of res judicata:

> Res judicata is one of the affirmative defenses that must be included in the defendant's answer. However, in appropriate circumstances, it may be raised in a Tenn. R. Civ. P. 12.02(6) motion.

*Id*. (internal citation omitted). "In order to succeed on a plea of res judicata, . . . the party raising the defense must plead it, and must carry the burden of proving it." *Gregory v. Gregory*, 803 S.W.2d 242, 244–45 (Tenn. Ct. App. 1990).

This Court has stated that under Tenn. R. Civ. P. 8.03, " 'any . . . matter constituting an affirmative defense' must be set forth in a pleading prior to trial. Failure to [plead] an affirmative defense generally results in a waiver of the defense." *ADT Sec. Servs., Inc. v. Johnson*, 329 S.W.3d 769, 778 (Tenn. Ct. App. 2009). Tenn. R. Civ. P. 8.03 provides that "[i]n pleading to a preceding pleading, a party shall set forth affirmatively facts in short and plain terms relied upon to constitute . . . res judicata . . . and any other matter constituting an affirmative defense."

*In re L.M.H.*, No. E2017-00604-COA-R3-PT, 2017 WL 4331037, at **4-5 (Tenn. Ct. App. Sept. 28, 2017), *no appl. perm. appeal filed*.

A careful and thorough review of the record on appeal reveals that Father did not set forth the issue of res judicata in a pleading prior to trial. The record on appeal reveals that Father did not raise the issue of res judicata until this appeal. As such, Father has waived this issue.

With regard to the issue of res judicata, we make two additional points. First, the petition at issue in this trial rested upon facts that occurred after the entry of the order from the previous termination trial, thus differentiating the claim or cause of action in the two suits. Second, as we noted in a slightly different context in the case of *In re: Kailee M.G.*: "To hold . . . that a petition to terminate parental rights once defeated operates as a bar to all future such petitions to terminate that parent's parental rights would be

ludicrous, and we expressly decline to so hold." *In re: Kailee M.G.*, No E2014-01602-COA-R3-PT, 2015 WL 1453427, at *12 (Tenn. Ct. App. March 27, 2015), *no appl. perm. appeal filed*.

Next, we consider whether the Trial Court erred in finding that clear and convincing evidence was proven of grounds to terminate for abandonment by wanton disregard pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(iv). The Trial Court found that clear and convincing evidence was proven to terminate Father's parental rights for abandonment by wanton disregard pursuant to Tenn. Code Ann. § 36-1-113(g)(1), which provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (2017). As pertinent, Tenn. Code Ann. § 36-1-102 provides:

> (1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> * * *
>
> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. If the four-month period immediately preceding the institution of the action or the four-month period immediately preceding such parent's incarceration is interrupted by a period or periods

36

of incarceration, and there are not four (4) consecutive months without incarceration immediately preceding either event, a four-month period shall be created by aggregating the shorter periods of nonincarceration beginning with the most recent period of nonincarceration prior to commencement of the action and moving back in time. Periods of incarceration of less than seven (7) days duration shall be counted as periods of nonincarceration. Periods of incarceration not discovered by the petitioner and concealed, denied, or forgotten by the parent shall also be counted as periods of nonincarceration. A finding that the parent has abandoned the child for a defined period in excess of four (4) months that would necessarily include the four (4) months of nonincarceration immediately prior to the institution of the action, but which does not precisely define the relevant four-month period, shall be sufficient to establish abandonment; or

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2017).

This Court discussed the ground of abandonment by wanton disregard in *In re Audrey S.* stating:

Tenn. Code Ann. § 36–1–102(1)(A)(iv) also reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. *Taxonomy of Children's Rights*, 11 WM. & MARY BILL RTS. J. at 958. However, parental incarceration is not an infallible predictor of parental unfitness. Accordingly, Tenn. Code Ann. § 36–1–102(1)(A)(iv)'s second test for abandonment does not make incarceration alone a ground for the termination of parental rights. An incarcerated or recently incarcerated parent can be found guilty of abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child. Thus, the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

* * *

37

We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child. *See, e.g., State Dep't of Children's Servs. v. J.M.F.*, No. E2003–03081–COA– R3–PT, 2005 WL 94465, at *7–8 (Tenn. Ct. App. Jan.11, 2005), *perm. app. denied* (Tenn. Mar. 21, 2005); *In re C. LaC.*, No. M2003–02164–COA– R3–PT, 2004 WL 533937, at *7 (Tenn. Ct. App. Mar.17, 2004) (No Tenn. R. App. P. 11 application filed); *In re C.T.S.*, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004); *In re C.W.W.*, 37 S.W.3d at 474–75.

*In re Audrey S.*, 182 S.W.3d 838, 866-68 (Tenn. Ct. App. 2005) (footnote omitted).

In the case now before us on appeal, the Trial Court found and held with regard to the ground of wanton disregard:

The Respondent father is currently incarcerated with an unknown release date. He has been in jail continuously since August 8 or 16, 2016. Thus, the father was in jail all or part of the four months prior to the Petition being filed. The record reflects a prior history of substantial criminal activity in 2011 which amounted to a net sentence of ten years. He was in jail from August 3, 2015 to May 3, 2016 on a violation of probation. After he got out of jail, he failed to appear for a drug screen due to his working, and then for the next screen he failed to show up after he said he would. He previously had a hair follicle while the children were in custody that was positive for THC. He was arrested for Public Intoxication on June 11, 2016, which was later dismissed.

The mother testified regarding an incident in August 2016 when she went to his motel room and he choked her to the point that it fractured her larynx. During a preliminary hearing on that matter, the father began screaming at the mother and was physically removed from the courtroom and returned to jail. The father did not deny that he yelled during the hearing.

The mother also testified about an incident in McDonald's in 2015 where the father became disorderly and was screaming.

On October 18, 2016, the father was ordered to serve the balance of a ten (10) year sentence for violation of probation.

The father's conduct exhibited a wanton disregard for the children's welfare.

The evidence in the record on appeal does not preponderate against the Trial Court's findings, which results in there being clear and convincing evidence of this ground. The record now before us on appeal reveals that Father was incarcerated when the petition to terminate his parental rights was filed and that Father engaged in behavior during the relevant time period that violated his probation resulting in Father again being incarcerated. We find no error in the Trial Court's determination that grounds were proven to terminate Father's parental rights to the Children for abandonment by wanton disregard.

We next consider whether the Trial Court erred in finding that clear and convincing evidence was proven of grounds to terminate for substantial noncompliance with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2). As pertinent, Tenn. Code Ann. § 36–1–113(g)(2) provides:

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4;

Tenn. Code Ann. § 36–1–113(g)(2) (2017).

With regard to the ground of substantial noncompliance with the permanency plan, the Trial Court specifically found and held:

> The Court finds that the Department has shown by clear and convincing evidence that the father has failed to substantially comply with the permanency plan requirements. By the Department's testimony, the father was making progress at one point prior to going to jail in August 2015: He participated in a mental health assessment while incarcerated and continued with the therapist while he was out of jail and even when he went back to jail. He paid child support while out of jail and provided appropriate housing and was pretty good with providing transportation, but with some issues.
>
> He went back to jail in August 2016 and has been incarcerated continuously since that time. He lived with his father prior to this period of incarceration. The plan required the father to notify the team if he had contact with the mother. The mother testified about the choking incident in

39

August 2016.  The father denies the incident or that he had seen the mother.  The Court does not give the father's testimony full faith and credit.

The father continued to incur new criminal charges.  He was charged with a violation of probation in September 2015 due to the video posted on Facebook.  The children were to begin overnight visits with the father at that time until the case manager observed the video.  He was ordered to serve 365 days at that time.

The father incurred another charge in June 2016, which was noted on the Permanency Hearing Order from June 29, 2016 (Exhibit 47).

The mother testified about their contact in 2016 and that she visited him in his motel room in August 2016 when the father choked her.  His probation was violated, and he is currently incarcerated with an uncertain and unknown release date.

The mother testified that the father drank alcohol regularly and has always done this.  The father appeared to be somewhat in denial about drinking alcohol.

In spite of the Court's reluctance to make the finding that it has, the law, requires the Court to find that the requirements of T.C.A. 36-1-113(g)(2) and 37-2-403(a)(2) have been met by clear and convincing evidence in a case in which the father undoubtedly loves his children;

The evidence in the record on appeal does not preponderate against these findings made by the Trial Court, which results in there being clear and convincing evidence as to this ground.  Furthermore, we note that the Trial Court made a specific finding with regard to Father's credibility finding Father to be not credible.

With regard to findings of credibility our Supreme Court has instructed:

When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing

40

evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011).

We give great deference to the Trial Court's finding that Father's testimony was not credible as the Trial Court had the opportunity to observe Father's demeanor and hear Father's in-court testimony. Given the evidence in the record on appeal, as discussed more fully above, we find no error in the Trial Court's determination that grounds were proven to terminate Father's parental rights to the Children for substantial noncompliance with the permanency plan.

Next, we consider whether the Trial Court erred in finding that clear and convincing evidence was proven of grounds to terminate for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3). As pertinent, Tenn. Code Ann. § 36–1–113(g)(3) provides:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36–1–113(g)(3) (2017).

Addressing the ground of persistent conditions, the Trial Court specifically found and held:

> The Court finds that the Department has proven by clear and convincing evidence the ground of Persistent Conditions. The children have been in the Department's custody since November 12, 2014 after they were removed from the father's home because he allowed the mother to

move in, despite a No-Contact order between herself and the children. The mother testified regarding an incident in August 2016 where the father choked her. Based on her testimony, the Court describes the relationship between the two as the father not being able to live without her and not being able to live with her. The conditions that led to removal still persist.

Other conditions also exist in the home that, in all reasonable probability, would lead to further neglect or abuse of the children: there is crime in [Father's] home and he is currently incarcerated with no certain release date.

Continuation of the parent/children relationship greatly diminishes the children's chances of being placed into a safe, stable, and permanent home: the children have been in the same foster home for the time they have been in custody. The children are fortunate to have such a good home while in foster care.

The evidence in the record on appeal, as discussed more fully above, does not preponderate against the Trial Court's findings, which results in there being clear and convincing evidence of this ground. We find no error in the Trial Court's determination that grounds were proven to terminate Father's parental rights to the Children for persistent conditions.

We next consider whether the Trial Court erred in finding that clear and convincing evidence was proven of grounds to terminate for failure to manifest an ability to parent pursuant to Tenn. Code Ann. § 36-1-113(g)(14), which provides:

(14) A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14) (2017).

With regard to the ground of failure to manifest an ability to parent, the Trial Court specifically found and held:

The Court also finds by clear and convincing evidence that the Department has proven the ground of failure to manifest an ability to parent as it applies to the father. The father was has [sic] been incarcerated since

42

August 2016 on a violation of probation which resulted from the assault on the mother. Prior to his incarceration, he was living with his father and had problems living there. The father was making progress, but the public intoxication charge in 2016 seemed to upend all progress.

Ms. West testified that the child Sophie expressed to her that she did not want to return to the father's home and that she was scared and afraid of her dad. Sophie wanted Ms. West to write a letter to the judge and tell him that she wanted to stay with the foster parents. During cross-examination of the DCS Case Worker, Krista Fox, when questioned about Sophie being afraid of her father, Ms. Fox responded that Sophie had only revealed to her that she was scared of her father because he yells when he drives and his driving scares her.

The Court finds that the father has failed to manifest by act or omission an ability and willingness to personally assume legal and physical custody of these children.

The evidence in the record on appeal, as discussed more fully above, does not preponderate against the Trial Court's findings, which results in there being clear and convincing evidence of this ground. Given the evidence in the record on appeal, we find no error in the Trial Court's determination that grounds were proven to terminate Father's parental rights to the Children for failure to manifest an ability to parent.

Finally, we consider whether the Trial Court erred in finding that clear and convincing evidence was proven that it was in the Children's best interests for Father's parental rights to be terminated. With regard to making a determination concerning a child's best interests, our Supreme Court has instructed:

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's

best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S*., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S*., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S*., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H*., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S*., 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In the case now before us on appeal, the Trial Court made the following findings with regard to its best interests analysis:

The Court also finds that the State has established by clear and convincing proof that it is in the best interest of the children for the father's rights to be terminated. The Court finds that the father has not made changes in his conduct or circumstances that would make it safe for the

children to go home, that there is crime in the father's home, . . .[5] but he has been unable to consistently show the required level of interest in the welfare of the children: he has been incarcerated this time since August 2016 with no certain release date, and he was having contact with the mother prior to his incarceration. Further, the children have established a strong bond with their foster parents, who wish to adopt them: the three children are extremely fortunate to have a good home while in foster care. Ms. Sluss testified that the foster home is as close to being a "real" home as it could be. She testified that the children exhibited behavior issues when the father visited and that they would be really anxious when they were aware that they had to go to court again. Ms. West testified that the child Sophia [sic] expressed that she was scared of her father and did not want to return to his home.

The evidence in the record on appeal, as discussed more fully above, does not preponderate against the Trial Court's findings, which results in there being clear and convincing evidence as to best interests. The Trial Court considered all of the relevant factors with regard to making a decision concerning the best interests of the Children, and we find no error in the Trial Court's determination that it is in the Children's best interests for Father's parental rights to be terminated.

Having found that grounds for termination were proven by clear and convincing evidence and that it was proven by clear and convincing evidence that it is in the Children's best interests for Father's parental rights to be terminated, we affirm the Trial Court's October 6, 2017 order terminating Father's parental rights to the Children.

### Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, Elijah O.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

---

[5] The Trial Court struck out a finding that Father had shown little or no interest in the welfare of the Children and inserted the following finding: "The Court has stricken this language because it is absolutely not true. [Father] quite often did show interest in the welfare of his children."